UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 18-mj-2513-Simonton

UNITED STATES OF AMERICA

vs.

MAURICIO ALVAREZ,

   Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?   _____ Yes   __x__ No

                              Respectfully submitted,

                              BENJAMIN G. GREENBERG
                              UNITED STATES ATTORNEY

                    BY:       _____
                              EMILY A. ROSE
                              Special Assistant United States Attorney
                              Court ID No. A5502275
                              99 Northeast 4th Street
                              Miami, Florida 33132-2111
                              Tel: (305) 961-9136
                              Fax: (305) 530-7976
                              Emily.Rose@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
|   | ) Case No. 18mj2513-Simonton |
| MAURICIO ALVAREZ, | ) |
|   | ) |
|   | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __4/1/2018__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1115 | Misconduct or neglect of ship officer |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jeremy Baldwin, Special Agent/CGIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04/06/2018

_____
*Judge's signature*

City and state: Miami, Florida     Hon. Andrea M. Simonton, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Jeremy Baldwin, Special Agent of the United States Coast Guard Investigative Service, (hereinafter, "CGIS"), being duly sworn, hereby depose and state the following:

1. I am a Special Agent with the United States Coast Guard Investigative Service (CGIS), Department of Homeland Security, and have been so employed for the past 12 years. I am currently assigned to the CGIS Resident Agent Office Miami, Florida as a Special Agent. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18 of the United States Code that is empowered by law to conduct investigations of and to make arrests for offenses enumerated in the United States Code.

2. The statements contained in this Affidavit are based on my personal knowledge, as well as information provided by other individuals, including law enforcement officials, and my review of records, documents and other physical items obtained during the course of this investigation. I have not included each and every fact known to me or law enforcement in this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that Mauricio Alvarez (ALVAREZ), while the captain or other person employed on a vessel, by misconduct, negligence, and inattention to his duties on such vessel did destroy the life of a person, that is, cause the death of R.M.P., in violation of Title 18, United States Code, Section 1115.

3. On or about April 1, 2018, a Miami-Dade 911 operator notified the United States Coast Guard (USCG) about a report that a person was trapped under the motor yacht (M/Y) MIAMI VICE, near Monument Island. USCG and local law enforcement units arrived at the scene of the reported incident and located M/Y MIAMI VICE adjacent to Monument Island, in Biscayne Bay, within Miami-Dade County, Florida.

4. Florida Fish and Wildlife Conservation Commission (FWC) initiated an investigation. According to information received during this investigation, M/Y MIAMI VICE was chartered for a four-hour period on April 1, 2018. Initial reports revealed that ALVAREZ was employed as the vessel captain of M/Y MIAMI VICE and his son, A.A., was employed as the First Mate. On the afternoon of April 1, 2018, M/Y MIAMI VICE departed a marina with approximately seven (7) passengers, ALVAREZ, and A.A.

5. An individual, later identified as R.M.P., was a passenger on M/Y MIAMI VICE. While M/Y MIAMI VICE was located adjacent to Monument Island in Biscayne Bay, R.M.P., along with a second passenger, were reportedly in the water in close proximity to the stern of M/Y MIAMI VICE. ALVAREZ reportedly engaged the engines of M/Y MIAMI VICE in reverse while R.M.P. was still swimming in the water. Preliminary information indicates that R.M.P. was struck by M/Y MIAMI VICE's propellers and killed. Another passenger of the M/Y MIAMI VICE was injured.

6. The passengers on the M/Y MIAMI VICE provided written statements to FWC. The injured passenger reported that he paid $3,000.00 to charter M/Y MIAMI VICE. The passenger further indicated that while he and R.M.P. were swimming in the water, R.M.P. got sucked up by the propeller.

7. A second passenger stated that on April 1, 2018, M/Y MIAMI VICE was at a sand bar, and two people from the vessel jumped in the water. The second passenger indicated they were going to pick up more friends and were getting ready to leave. The second passenger was on the vessel at this time. The second passenger stated that the captain never informed anyone that M/Y MIAMI VICE was officially leaving, nor did the captain come to the back of the vessel to double-check if everyone boarded the vessel again. After the engines started, one of the

individuals in the water began yelling to turn the engines off. Once the engines stopped, the second passenger noticed a cloud of blood in the water.

8. On or about April 2, 2018, law enforcement conducted a consensual search of M/Y MIAMI VICE. Law enforcement observed the location of the throttle and captain's chair on M/Y MIAMI VICE. Based on my training, experience, and personal observations, a captain and/or operator of M/Y MIAMI VICE would not be able to see the stern of the vessel or ensure the safety of any remaining swimmers in the water while engaging the engines from this location without assistance from another individual.

9. On or about April 5, 2018, CGIS established phone contact with ALVAREZ. During a phone interview with CGIS, ALVAREZ stated he was hired to serve as captain on M/Y MIAMI VICE. ALVAREZ claimed he started chartering M/Y MIAMI VICE six months ago and has completed approximately forty charters on the vessel. ALVAREZ indicated that on April 1, 2018, the owner of M/Y MIAMI VICE employed him as the Captain of M/Y MIAMI VICE for a four hour charter, and A.A. was employed as the First Mate. ALVAREZ also stated that he was to be paid $150 per hour for the four hours of the charter on M/Y MIAMI VICE.

10. ALVAREZ stated that during the charter, the M/Y MIAMI VICE was stopped adjacent to Monument Island and his passengers were swimming in the water. ALVAREZ claimed that one of the passengers requested to depart so that they could pick up another passenger at a nearby marina. ALVAREZ indicated that he agreed and told the passengers who were swimming in the water to get back on M/Y MIAMI VICE. He stated he electronically placed the stern ladder onto M/Y MIAMI VICE and then walked to the operating chair to start the engines. The stern ladder on M/Y MIAMI VICE is used to allow swimmers re-entry onto the vessel from the water. Once he started the engines and placed the vessel into reverse, ALVAREZ stated that he heard a

loud scream coming from the rear of the M/Y MIAMI VICE. ALVAREZ claimed that he ran to the rear of the vessel and noticed one of the passengers was in the water yelling that he could not feel his legs. ALVAREZ then jumped into the water to pull the passenger into the vessel. ALVAREZ stated that he noticed blood in the water and could not locate the second passenger.

11. ALVAREZ further stated that he regretted not ensuring every passenger knew that he was going to start the M/Y MIAMI VICE'S engines. ALVAREZ stated his First Mate, A.A., his son, was standing next to him when he engaged the engines in reverse. He never instructed A.A. to stand at the rear of the vessel to see if anyone was in the water. ALVAREZ also admitted to not having a United States Captain license and never having any formal class training on operating a motor vessel. ALVAREZ also stated that the M/Y MIAMI VICE is the largest vessel he has every operated.

12. Based on my training, experience, personal observations, and conversations with other experienced boat captains, a captain and/or operator of a vessel the size of the M/Y MIAMI VICE who is not able to see the stern of the vessel from the piloting location, should ensure all of the passengers on the vessel are notified that the engines are about to be engaged, that all swimmers are out of the water before engaging the engines, and require a lookout to stand watch at the stern of the vessel while operating in reverse.

13. Law enforcement investigation revealed that ALVAREZ was stopped on March 18, 2018, and issued a Notice of Violation by the USCG for operating an illegal charter while being an unlicensed Captain. The illegal charter was terminated at that time by the USCG.

14. On April 5, 2018, law enforcement discovered that ALVAREZ and A.A. had purchased airline tickets that same morning to depart Fort Lauderdale International Airport and travel to Panama City, Panama on Spirit Airlines. During the consensual phone interview of

4

ALVAREZ on April 5, 2018, ALVAREZ indicated that he had plans to travel to Orlando, Florida to visit a family member. ALVAREZ stated he was staying with his family in Fort Lauderdale, Florida, but did not provide an address when asked. ALVAREZ also never mentioned his scheduled planned travel to Panama to CGIS during the consensual phone interview. According to airline records, ALVAREZ attempted to purchase his airline ticket to Panama prior to his phone call with law enforcement, but his credit card was declined. ALVAREZ finalized the purchase of the airline ticket to Panama after his phone call with law enforcement and an incorrect date of birth was submitted for his ticket.

15. On the evening of April 5, 2018, law enforcement observed ALVAREZ and A.A. at Fort Lauderdale International airport. ALVAREZ and A.A. had several large bags with them. Law enforcement detained ALVAREZ and A.A. at the airport to conduct an interview. In a post-*Miranda* interview, ALVAREZ stated he was attempting to leave the United States because he was scared of being criminally charged and felt he could make a better decision of what to do if he was outside the United States. A review of ALVAREZ's passport revealed that he had been issued a new passport on April 5, 2018.

16. Based on the foregoing facts, I submit that probable cause exists that on or about April 1, 2018, in Miami-Dade County, in the Southern District of Florida, Mauricio ALVAREZ, in Miami-Dade County, in the Southern District of Florida, Mauricio ALVAREZ, while the captain or other person employed on a vessel, by misconduct, negligence, and inattention to his duties on such vessel did destroy the life of a person, that is, cause the death of R.M.P., in

5

violation of Title 18, United States Code, Section 1115.

FURTHER AFFIANT SAYETH NAUGHT.

                                         Jeremy Baldwin, Special Agent
                                         U.S. Coast Guard Investigative Service

Subscribed and sworn to before me
this 6th day of April, 2018.

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

6